Filed 12/15/21  Adams Antioch Warehouse v. City of Antioch CA1/5
## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| ADAMS ANTIOCH WAREHOUSE L.P.,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>CITY OF ANTIOCH,<br><br>    Defendant and Respondent. | A161915<br><br>(Contra Costa County<br>Super. Ct. No. C18-02260) |

Plaintiff and appellant Adams Antioch Warehouse L.P. (Adams) appeals from the trial court's judgment following its order sustaining the demurrer of defendant and respondent City of Antioch (City) to the five causes of action against it in Adams's Second Amended Complaint (SAC).  We affirm as to one cause of action, but we reverse as to the remaining four causes of action.

## BACKGROUND

In 1947, a certain tract of land in Antioch was subdivided into lots and streets and represented on a map filed with the Contra Costa County Recorder.  The 1947 map depicted a street named Cesa Lane.  In 1962, in Resolution No. 1993-A (1962 Resolution), City abandoned Cesa Lane as a public street.  The 1962 Resolution found Cesa Lane had "never been used as

1

a public street or for any other public purpose, and that said CESA LANE is unnecessary for present or prospective public street purposes." The 1962 Resolution excepted from the abandonment "the easement and right at any time or from time to time to construct, maintain, operate, replace, remove, renew and enlarge lines of pipe, and other convenient equipment and fixtures for the operation of natural gas lines and for incidental purposes including access to protect property from all hazards in, upon and over the portion of CESA LANE hereinbefore abandoned" (Easement). The 1962 Resolution stated the exception was "pursuant to" (former) section 8330 of the Streets and Highways Code.[1]

Appellant Adams owns property abutting Cesa Lane, having acquired title to Lot A on the 1947 subdivision map in 1963.[2] The Adams property has a large commercial warehouse building on it, with large bay doors in the rear used by multiple tenants.

In 2001, City adopted Resolution No. 2001/102 (2001 Resolution). The 2001 Resolution was entitled "Resolution of the City Council of the City of Antioch Authorizing Mayor to Execute Quitclaim Deed to Adjoining Property Owner of Cesa Lane." (Capitalization omitted.) The 2001 Resolution referenced the 1962 Resolution; stated, "pursuant to California Civil Code

---

[1] All undesignated statutory references are to the Streets and Highways Code.

[2] Technically, an individual, F.L. Adams, Jr., along with a business partner, acquired title to Lot A in 1963. In 1973, F.L. Adams, Jr. acquired 100% ownership of Lot A, and, in 1995, the property was placed into a revocable family trust (Adams Trust). In 2003, F.L. Adams, Jr. and his wife formed Adams Antioch Warehouse L.P., and the title to Lot A was transferred to the limited partnership (the present appellant) by quitclaim deed. For the purposes of the present appeal, we use Adams to refer to all of the entities that have owned Lot A since 1963, except where it is necessary to refer to the trust and limited partnership separately.

§ 831, the adjoining property owner to a vacated street automatically owns to the center of the vacated street;" and recited, "an adjoining property owner, the Railroad Avenue Church of Christ [Church], desires to have a definitive determination of its ownership of the abandoned area of the former street, which can be accomplished by the execution and recordation of a Quitclaim Deed." The City then resolved "that the Mayor is hereby authorized and directed to sign on behalf of the City that certain Quitclaim Deed, a copy of which is attached hereto, regarding this property to the [Church]." Thereafter, a quitclaim deed (Quitclaim) was recorded quitclaiming a portion of Cesa Lane to the Church. Adams did not receive notice before or after recordation of the Quitclaim.

Defendants Jason Walker (owner of fee title), Bank of the West (holder of a security interest by a deed of trust), First Santa Clara Corporation (trustee under a deed of trust), and Service Pros Plumbers, Inc. (holder of a leasehold interest) (collectively, the Walker Defendants), are the successor owners to the Church.[3] In March or April 2018, the Walker Defendants placed a large metal shipping container on a portion of Cesa Lane quitclaimed to the Church in 2001. The obstruction reduced the usable width of the lane, denying Adams, its tenants, customers, and vendors the use of that portion of Cesa Lane. In particular, the shipping container prevents most large trucks from accessing the large bay doors in the rear of the Adams warehouse building.

In November 2018, Adams filed the present action, and, in January 2019, Jason Walker filed a cross-complaint. In March 2020, Adams filed a first amended complaint against the Walker Defendants and City, stating causes of action for declaratory relief, to quiet title, and for an injunction. In

---

[3] The Walker Defendants are not involved in the present appeal.

May 2020, City demurred to the first amended complaint, contending that the two causes of action against City (for declaratory relief and to quiet title) were untimely. In July 2020, the trial court sustained City's demurrer with leave to amend.

In August 2020, Adams filed the SAC, adding various allegations and adding causes of action against City seeking issuance of a writ of mandate (Code Civ. Proc. § 1085), issuance of a writ of administrative mandate (Code Civ. Proc. § 1094.5), and reformation of the Quitclaim. Adams alleged, among other things, that City violated the Streets and Highways Code in recording the Quitclaim, that the Quitclaim is invalid for several other reasons, and that Adams is the true owner of the disputed portion of Cesa Lane or at least has an easement over that portion.

In September 2020, City demurred to the SAC on two grounds. City contended all of the causes of action were untimely, and City contended the Quitclaim did not constitute abandonment of the Easement. In December 2020, the trial court rejected the latter argument, but sustained the demurrer to the SAC on the ground of untimeliness and several other grounds articulated in its decision, without leave to amend. The trial court entered judgment in favor of City and the present appeal followed.[4]

---

[4] On April 9, 2021, Adams filed a request for judicial notice of several documents and asserted facts. The request is denied because it is not necessary to consider any of the matters identified in the request to resolve the present appeal.

4

DISCUSSION

" ' "On appeal from an order of dismissal after an order sustaining a demurrer, the standard of review is de novo: we exercise our independent judgment about whether the complaint states a cause of action as a matter of law." ' [Citation.] In reviewing the complaint, 'we must assume the truth of all facts properly pleaded by the plaintiffs, as well as those that are judicially noticeable.' " (*Travelers Indem. Co. of Connecticut v. Navigators Specialty Ins. Co.* (2021) 70 Cal.App.5th 341, 353.) However, "[w]here facts appearing in attached exhibits or judicially noticed documents contradict, or are inconsistent with, the complaint's allegations, we must rely on the facts in the exhibits and judicially noticed documents." (*Genis v. Schainbaum* (2021) 66 Cal.App.5th 1007, 1015 (*Genis*).) "We may affirm on any basis stated in the demurrer, regardless of the ground on which the trial court based its ruling." (*Navigators Specialty*, at p. 353.)

I.    *Adams's Allegations Support Tolling the Limitations Period Under the Delayed Discovery Rule*

The trial court concluded all of Adams's claims against the City were untimely. We conclude the court erred because the allegations in the SAC support tolling under the discovery rule.[5]

Competing policies are balanced through statutes of limitation. "One purpose is to give defendants reasonable repose, thereby protecting parties from 'defending stale claims, where factual obscurity through the loss of time, memory or supporting documentation may present unfair handicaps.' [Citations.] A statute of limitations also stimulates plaintiffs to pursue their claims diligently. [Citations.] A countervailing factor, of course, is the policy

---

[5] We need not and do not consider Adams's other alleged grounds for tolling the statute of limitations.

5

favoring disposition of cases on the merits rather than on procedural grounds." (*Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 806 (*Fox*).) The statute of limitations generally begins to run when an action accrues, usually on the date of injury. (*Bernson v. Browning-Ferris Indus.* (1994) 7 Cal.4th 926, 931.)

The "discovery rule" "postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action." (*Fox, supra*, 35 Cal.4th at p. 807; accord *Aryeh v. Canon Business Solutions, Inc.* (2013) 55 Cal.4th 1185, 1192 (*Aryeh*).) A plaintiff has reason to discover a cause of action when the plaintiff has reason to suspect a factual basis for wrongdoing, causation, and harm. (*Fox*, at p. 807.) "Rather than examining whether the plaintiffs suspect facts supporting each specific legal element of a particular cause of action, we look to whether the plaintiffs have reason to at least suspect that a type of wrongdoing has injured them." (*Ibid.*) "The discovery rule only delays accrual until the plaintiff has, or should have, inquiry notice of the cause of action." (*Ibid.*) "[P]laintiffs are required to conduct a reasonable investigation after becoming aware of an injury, and are charged with knowledge of the information that would have been revealed by such an investigation." (*Id.* at p. 808.)

In support of tolling under the delayed discovery rule, the SAC alleges, "In the latter half of 2018 … representatives of [Adams] first discovered the existence of the [Quitclaim] when attempting to find out any possible basis for the partial blocking of Cesa Lane. At all times between October 5, 2001 (the date of recording of the [Quitclaim]) and March or early April of 2018 (when the partial blocking of Cesa Lane occurred), there were no facts or circumstances to put [Adams] on notice that the [Quitclaim] existed, in that the full width of the North-South Segment of Cesa Lane remained

6

unobstructed … and was used by [Adams], their tenants, their tenants' customers, their tenants' vendors, and the fire department, to gain ingress to, and egress from, the Adams real property, including the large bay doors in the rear of the warehouse building. . . . The partial blocking of Cesa Lane in March or early April of 2018, for the first time, made representatives of [Adams] aware that something was different regarding Cesa Lane." (Some capitalization omitted.)

In support of its position that the delayed discovery rule does not apply, City first argues that the Adams limited partnership may not rely on the Adams Trust's "lack of awareness of injury." City cites no authority supporting that proposition. Under the discovery rule, any causes of action arising out of the Quitclaim did not *accrue* until the deed was (or should have been) discovered. (See *Fox, supra*, 35 Cal.4th at pp. 806–807 ["statutes of limitation do not begin to run until a cause of action accrues" and "the 'discovery rule,' … postpones accrual of a cause of action"].) Further, a subsequent owner may assert a cause of action where discovery occurs after the transfer of ownership. (See *Siegel v. Anderson Homes, Inc.* (2004) 118 Cal.App.4th 994, 1014 [latent construction defects litigation]; *Standard Fire Ins. Co. v. Spectrum Cmty. Assn.* (2006) 141 Cal.App.4th 1117, 1145 [same].) The allegations in the SAC are sufficient to show the cause of action did not accrue under the prior owner (the Adams Trust).

City next argues Adams was not entitled to notice of the Quitclaim. But the City fails to explain how that is relevant to the statute of limitations analysis. A failure to provide required notice might be necessary to support tolling under the "fraudulent concealment" doctrine (*Aryeh, supra*, 55 Cal.4th at p. 1192), but City cites no authority that concealment is required to support tolling under the discovery rule. City's argument that Adams was

7

not entitled to notice is relevant to the merits of the causes of action in the SAC, but City cites no authority that issue is relevant in applying the delayed discovery rule.

City also argues the facts as alleged in the SAC "make clear that Adams—in its current legal capacity [as a limited partnership]—could have had constructive notice before it acquired its property that the City had conveyed all interest it possessed in Cesa Lane. There is no dispute the quitclaim deed conveyed to Walker's predecessor in 2001 was recorded in the County's Official Records and would have been available to Adams during any due diligence it conducted before acquiring its property in 2003." But this contention ignores Adams's argument the Quitclaim would *not* have been discoverable, because, "even if the 2003 Transfer created a duty to look for prior recorded documents, the 2001 Quitclaim would not have been found because it was outside" the chain of title of Adams's property. City cites no authority that the Quitclaim would have been recorded on the title for that property, or would have been discovered during any title inspection prior to the 2003 transaction conveying that property to the limited partnership. Because this aspect of application of the delayed discovery rule turns on resolution of factual issues relating to constructive notice, it was not a proper subject for resolution by demurrer.[6]

---

[6] The SAC does not expressly allege in its discussion of the delayed discovery doctrine that the Quitclaim would not be discovered in a search of the title to Adams's property. However, reading "the complaint as a whole and giv[ing] it a reasonable interpretation" (*Sims v. Kernan* (2018) 30 Cal.App.5th 105, 110), and accepting "as true all facts that may be implied or inferred from those expressly alleged" (*Guerrero v. Superior Ct.* (2013) 213 Cal.App.4th 912, 925), we construe the SAC to so allege. The SAC attaches as Exhibit G what it alleges to be "the entire chain of title" to Adams's property, and it does not include the Quitclaim. Further, the SAC alleges there "were no facts or circumstances" to put Adams on notice of the

Because the facts as alleged in the SAC would support tolling of the statute of limitations under the delayed discovery rule, the trial court erred in sustaining the City's demurrer on the ground that Adams's claims are untimely.[7]

II. *The Alternate Bases Identified by the Trial Court and City Support Affirmance Only as to the Fifth Cause of Action*

The trial court's primary ground for sustaining the demurrer was the statute of limitations, and that is the primary ground advanced by City on appeal in support of the judgment. But the trial court also identified other

---

Quitclaim and Adams "could not, with reasonable investigation, have discovered" the Quitclaim because "[a] reasonable person in the community …. does not periodically run title searches on City rights of way adjacent to their property to see if those rights of way have been vacated or sold by the City."

[7] We recognize a line of authority has held it is inappropriate to apply the discovery rule to save challenges to *certain types* of government enactments. In particular, in *Utility Cost Management v. Indian Wells Valley Water Dist.* (2001) 26 Cal.4th 1185, the court declined to apply the rule to an action by a public agency to recover amounts paid to a public utility for capital improvements. The court reasoned that a broad "application of the discovery rule would be directly at odds with the legislative intent to give public utilities certainty with respect to the enforceability of their fee ordinances and resolutions. [Citations.] If a plaintiff could challenge fee legislation any number of years after the legislation was adopted simply by taking advantage of the discovery rule and without any allegation that critical information was withheld, then public utilities would be left in a continuous state of fiscal uncertainty, which ultimately would only increase costs for consumers." (*Id.* at p. 1197; accord *Hogar Dulce Hogar v. Cmty. Dev. Comm'n* (2003) 110 Cal.App.4th 1288, 1297.) In the present case, City does *not* argue the discovery rule is inapplicable under that line of authority, and it appears the City's interest in the finality of its Quitclaim is not comparable to the interests at issue in those cases.

grounds for sustaining the demurrer.[8]  We conclude one alternate ground supports affirmance as to the fifth cause of action, but not as to the first four causes of action.

A.    *First Cause of Action*

The first cause of action in the SAC is styled as a "Taxpayers' Action for Declaratory Relief to Set Aside Quitclaim Deed as Ultra-Vires Act of City." The SAC alleges that City owned the Easement prior to recordation of the Quitclaim; that the Easement is a "public service easement" (§ 8306); that the Quitclaim constituted "vacation" of the Easement (§ 8309); that City failed to comply with the statutory procedures in the Streets and Highways Code in various respects before recording the Quitclaim; and that City did not receive compensation for relinquishing its interest in the Easement, as required by Article XVI, section 6, of the California Constitution.  The SAC seeks "a declaration that the adoption of the 2001 RESOLUTION and the issuance of the CITY QUITCLAIM DEED were ultra-vires acts by Defendant CITY and are null and void and of no effect."

In its order, the trial court rejected Adams's theories regarding the illegality of the Quitclaim on the merits.  The court concluded that City was

---

[8] As noted previously, City's demurrer to the SAC was based only on timeliness and on an argument that the Quitclaim did not constitute abandonment of the Easement.  The latter argument was based on the absence of a reference to the Easement in the resolution that authorized the Quitclaim or the Quitclaim itself.  The trial court rejected that argument, reasoning "[t]he fact is that the day before the quitclaim deed was given, the City had a public service easement, and the day after the quitclaim deed, it didn't."  We agree: "A quitclaim deed, being a transfer and release to the grantee of whatever present title or interest the grantor has in the property quitclaimed, when made by the owner of an easement to the owner of the servient tenement operates as a release and extinguishment." (*Westlake v. Silva* (1942) 49 Cal.App.2d 476, 478.)  City cites no contrary authority in its brief on appeal.

10

not required to provide notice of vacation of the Easement, make findings, or conduct a hearing under section 8333; that the allegations in the SAC do not support a claim that vacation of the easement was not in the public interest; and that vacation of the easement was not an unlawful gift of public property. Many of those conclusions appear to be well taken. However, Adams is correct that section 8335, the statutory procedure providing for vacation of an easement without notice, required the City to vacate the Easement via a "resolution of vacation" including several specific declarations.[9] Adams is also correct that City could not fashion its own procedure to abandon the Easement. (See *County of San Diego v. California Water & Tel. Co.* (1947) 30 Cal.2d 817, 823 [in analogous context of road abandonment, stating "if the Legislature has provided a method by which a county or city may abandon or vacate roads, that method is exclusive"]; accord *Zack's, Inc. v. City of Sausalito* (2008) 165 Cal.App.4th 1163, 1186; *Wright v. City of Morro Bay* (2006) 144 Cal.App.4th 767, 772–773; see also

---

[9] Section 8335, subdivision (a)(1) provides that a "legislative body may vacate a street, highway, or public service easement pursuant to the authority provided in this chapter by adopting a resolution of vacation." Subdivision (b) states, in relevant part, "The resolution of vacation shall state all of the following: [¶] (1) That the vacation is made under this chapter. [¶] (2) The name or other designation of the street, highway, or public service easement and a precise description of the portion vacated. The description of the portion vacated may be by a precise map which is recorded or to which reference is made in the resolution and which is permanently maintained by the public entity. [¶] (3) The facts under which the summary vacation is made. If the vacation is made pursuant to Section 8332, the statement shall include the date of the agreement. The resolution is prima facie evidence of the facts stated. [¶] (4) That from and after the date the resolution is recorded, the street, highway, or public service easement vacated no longer constitutes a street, highway, or public service easement." Section 8335 was amended after 2001, but the amendments did not affect the language Adams relies upon. (Stats. 2015, ch. 269 (Sen. Bill No. 184), § 36, eff. Jan. 1, 2016.)

11

*Alameda Cty. Deputy Sheriff's Ass'n v. Alameda Cty. Employees' Ret. Ass'n*
(2020) 9 Cal.5th 1032, 1068 ["an agreement cannot be used to avoid legally
prescribed procedures by dictating a result that, although within an agency's
power, can be achieved only by following those procedures"].)  City's brief on
appeal fails to respond to Adams's argument in this respect.  Accordingly,
even assuming the trial court was correct in rejecting Adams's other
challenges to the validity of the Quitclaim—which we need not and do not
decide—the court erred in sustaining the demurrer to the first cause of action
on the ground that the allegations in the SAC failed to show *any* valid
challenge to the Quitclaim.

In the alternative, City argues any illegal abandonment of the
Easement is irrelevant to the Walker Defendants' use of Cesa Lane because
"the interest abandoned . . . only . . . implicated the *sub-surface* use of Cesa
Lane" and "the undoing of such a conveyance" would not "lead to any
practical benefit for Adams."  City continues, "If the City still retains the
easement, that would not mean the City could compel the [Walker
Defendants] to remove the shipping container they have placed on the surface
of the alleyway.  At most, the City could compel the *temporary* moving of the
container to allow it to construct or access any pipes or lines underneath the
alleyway surface."  We disagree the Easement only permits subsurface use,
because it also allows for incidental access to protect gas lines and other
related equipment.[10]  City's argument *does* raise the question whether the

---

[10] The Easement states that it is for "the operation of natural gas lines
and for incidental purposes including access to protect property from all
hazards in, upon and over the portion of CESA LANE hereinbefore
abandoned."  Section 8340, subdivision (a) of the Streets and Highways Code
authorizes a public entity to reserve easements for the operation of gas
pipelines, among other utilities, "and for incidental purposes, including
access to protect these works from all hazards in, upon, and over the street or

placement of the shipping container would unreasonably interfere with the Easement, if Adams were to succeed in invalidating the Quitclaim. (See *Camp Meeker Water System, Inc. v. Public Utilities Com.* (1990) 51 Cal.3d 845, 867 [" 'The general rule is clearly established that, despite the granting of an easement, the owner of the servient tenement may make any use of the land that does not interfere unreasonably with the easement.' "].) That, however, is a question of fact that may not be resolved in a demurrer. (*Red Mountain, LLC. v. Fallbrook Pub. Util. Dist.* (2006) 143 Cal.App.4th 333, 354; accord *Schmidt v. Bank of Am., N.A.* (2014) 223 Cal.App.4th 1489, 1504.)

In any event, even assuming placement of the shipping container is *not* inconsistent with the Easement—and, thus, the Quitclaim was *not* material to the Walker Defendants' use of the disputed portion of Cesa Lane—City does not explain why that defeats Adams's causes of action based on the invalidity of the Quitclaim.[11] As explained above, the SAC alleges City

---

highway proposed to be vacated." Even though that statute was not enacted until 1980 (Stats. 1980, ch. 1050, § 29, p. 3367), subdivision (a) "continues the substance of former" section 8330, which was enacted in 1943 and expressly referenced in the 1962 Resolution. (Stats. 1943, ch. 427, § 1, p. 1962; Recommendation Relating to Vacation of Public Streets, Highways, and Service Easements (Sep. 1979) 15 Cal. Law Revision Com. Rep. (1980), p. 1158; see also *Gund v. Cty. of Trinity* (2018) 24 Cal.App.5th 185, 199 [regarding reliance on Law Revision Commission recommendations].) The parties agree the most reasonable interpretation of the Easement is that it is analogous to that authorized in section 8340, subdivision (a). That is, the Easement is for the operation of natural gas lines and incidental purposes, including access to protect those works from all hazards.

[11] The SAC does not allege unreasonable interference with the Easement as construed in footnote 10, *ante*, because the SAC assumes the Easement allows fire department access. Because City has not demonstrated a showing of unreasonable interference is necessary for Adams to state a claim, we need not direct that Adams be given leave to amend to so allege. To the extent Adams desires to amend the SAC in any way in light of this

13

violated section 8335 in issuing the Quitclaim, and the SAC alleges Adams is the legal owner of the property at issue in the Quitclaim. City fails to explain why that is insufficient to support Adams's cause of action for declaratory relief.[12]

Because the first cause of action does not fail to state a claim under any alternate ground articulated by the trial court or City, the court erred in sustaining the demurrer to that cause of action.

B.     *Second and Third Causes of Actions*

The second cause of action in the SAC seeks issuance of a writ of mandate (Code Civ. Proc. § 1085) and the third cause of action seeks issuance of a writ of administrative mandate (Code Civ. Proc. § 1094.5). The causes of action seek to set aside the Quitclaim as well as "command [City] to comply with applicable provisions of the Streets and Highways Code if it should seek to relinquish the [Easement] in the future."

The trial court rejected those causes of action on the ground of untimeliness and based on its analysis of the first cause of action. The court stated, "[Adams's] theory in seeking either ordinary or administrative mandate rest on its assertion that the City was obligated to comply with legal requirements of notice and hearing before vacating the easement. But the

---

court's construction of the Easement, that is a matter that can be addressed on remand.

[12] We observe that Adams argues it is prejudiced by the Quitclaim regardless of whether the Walker Defendants' use of Cesa Lane interferes with the Easement. Thus, Adams argues, "[Walker] is asserting that the 2001 Quitclaim gave him 'color of title' to Cesa Lane for adverse possession purposes. [Citation.] Voiding the 2001 Quitclaim and returning title to the City will end that claim because City owned property (whether it be land or easement) cannot be adversely possessed. (Civil Code § 1007.)" City fails to respond to this argument in its brief, and we need not and do not address it.

14

Court has already held that there were no such requirements." As explained above, the facts alleged *do* show a violation of section 8335, so the alternate ground articulated by the trial court is insufficient to support affirmance. And City advances no other grounds to affirm as to those causes of action.

C.    *Fourth Cause of Action*

The fourth cause of action in the SAC is a quiet title claim. The SAC alleges Adams is the owner of the disputed portion of Cesa Lane under the " 'doctrine of marginal streets' " (*Besneatte v. Gourdin* (1993) 16 Cal.App.4th 1277, 1282), or that Adams has an access easement under several different theories. The SAC further alleges that both City and the Walker Defendants claim an adverse interest in the disputed portion of Cesa Lane. The SAC requests a determination of the various claims to ownership and the easement claims.

"In an ordinary action to quiet title it is sufficient to allege in simple language that the plaintiff is the owner and in possession of the land and that the defendant claims an interest therein adverse to him." (*S. Shore Land Co. v. Petersen* (1964) 226 Cal.App.2d 725, 740; see also *Gray v. Walker* (1910) 157 Cal. 381, 384 [same]; *West v. JPMorgan Chase Bank, N.A.* (2013) 214 Cal.App.4th 780, 802–803 ["An element of a cause of action for quiet title is '[t]he adverse claims to the title of the plaintiff against which a determination is sought.' "].) In rejecting the quiet title cause of action, the trial court, in addition to timeliness, relied on the circumstance that City "expressly disclaim[s] having any interest in the property adverse to plaintiff." But the mere fact that City disclaims an interest in Cesa Lane is not a proper ground for sustaining the demurrer as to that cause of action, because "[i]n a quiet title action, a defendant who disclaims an interest in the plaintiff's land is not entitled to judgment in his favor. [Citation.] Instead,

15

the judgment should quiet title against the disclaiming defendant." (*Linthicum v. Butterfield* (2009) 175 Cal.App.4th 259, 269–270.)

Because the fourth cause of action does not fail to state a claim under any alternate ground articulated by the trial court or City, the court erred in sustaining the demurrer to that cause of action.

D.     *Fifth Cause of Action*

The fifth cause of action in the SAC seeks reformation of the Quitclaim to name Adams as the grantee instead of the Walker Defendants' predecessor.  The SAC alleges the Quitclaim is based on a mistake of law, in that Adams was the owner of the disputed portion of Cesa Lane under the " 'doctrine of marginal streets.' " (*Besneatte v. Gourdin, supra,* 16 Cal.App.4th at p. 1282.)  In rejecting the reformation cause of action, the trial court, in addition to concluding the claim was untimely, reasoned that Adams "has no standing to reform the quitclaim deed, as it was not a party to deed."  The trial court properly rejected the reformation claim.

" 'When, through ... mistake ..., a written contract fails to express the real intention of the parties, such intention is to be regarded, and the erroneous parts of the writing disregarded.'  (Civ. Code, § 1640.)  If there is 'a mutual mistake of the parties,' a written contract 'may be revised, on the application of a party aggrieved, so as to express that intention, so far as it can be done without prejudice to rights acquired by third persons, in good faith and for value.'  (*Id.,* § 3399.)  In reforming the written agreement, a court may 'transpose[ ], reject[ ], or suppl[y]' words [citation], but has ' "no power to make new contracts for the parties" ' [citation].  Rather, the court may only reform the writing to conform with the mutual understanding of the parties at the time they entered into it, if such an understanding exists." (*Hess v. Ford Motor Co.* (2002) 27 Cal.4th 516, 524.)

16

As the trial court observed, Adams was not a party to the Quitclaim, and Adams has not and cannot plausibly allege the parties intended it to be named as the grantee in the Quitclaim. Adams argues the requirement of mutual mistake is inapplicable where the writing at issue is a gift and cites authority that the requirement is inapplicable in the context of reformation of wills. But, even assuming the requirement of mutual mistake is inapplicable here, Adams's reformation claim still fails. The SAC's allegation that the parties intended "to make the party who was legally entitled to" ownership the grantee is contrary to the Quitclaim itself, which expressly states City was acting in response to the Church's "desire[] to have a definitive determination of its ownership of the abandoned area of the former street." We must give precedence to the Quitclaim, which provides no basis to conclude City would have issued a Quitclaim in favor of *any* owner had it been aware there was a dispute as to ownership of the portion of Cesa Lane at issue. (*Genis*, *supra*, 66 Cal.App.5th at p. 1015.)

The trial court properly concluded the SAC fails to state a reformation claim against City.

## DISPOSITION

The judgment sustaining the demurrer as to appellant's first through fourth causes of action is reversed. The judgment is affirmed as to appellant's fifth cause of action. The matter is remanded for further proceedings consistent with this opinion. The parties shall bear their own costs on appeal.

17

_____

SIMONS, Acting P. J.

We concur.

_____

NEEDHAM, J.

_____

BURNS, J.

(A161915)

18